1    UNITED STATES DISTRICT COURT
2    DISTRICT OF PUERTO RICO
3
4

ROLANDO LAVIENA-TORRES, et al.,

    Plaintiffs,                                    Civil No. 12-1277 (JAF)

    v.

CARLOS COLON-ALSINA, et al. ,

    Defendants.

5
6                           **<u>OPINION AND ORDER</u>**

7           Plaintiff sues, alleging violations of his rights under the United States Constitution

8    via 42 U.S.C. § 1983.  (Docket No. 18.)  Plaintiff also raises supplemental claims under

9    Puerto Rico law, including under the Constitution of the Commonwealth of Puerto Rico;

10   29 L.P.R.A. § 194 <u>et seq.</u> ("Law 115"); and Puerto Rico's general tort statute, 31

11   L.P.R.A. § 5141 ("Article 1802").  (Docket No. 18.)  Codefendants Carlos Colón-Alsina,

12   Leovigildo Vázquez-Bonilla, José Figueroa-Sancha, and Guillermo Somoza-Colombani

13   (hereinafter collectively "Movants"[1]) move for dismissal under Federal Rule of Civil

14   Procedure 12(b)(6).   (Docket No. 27.)   In a separate motion, codefendant William

15   Echevarría (hereinafter "Echevarría") moves for dismissal under Federal Rule of Civil

16   Procedure 12(b)(6).[2]  (Docket No. 34.)  Plaintiff opposes.  (Docket No. 40.)

---

[1] Because of the relatively large number of claims and defendants in this action, we include the name of each individual movant—Colón-Alsina, Vázquez-Bonilla, Figueroa-Sancha, and Somoza-Colombani—each time that we refer to "Movants" in this opinion.

[2] Emilio Díaz-Colón and Jorge Luyando are the only named defendants who did not move for dismissal.

1                                      **I.**

2                              **Factual Allegations**

3         We draw upon the second amended complaint, (Docket No. 18), to create the

4    following summary of the facts alleged.   Plaintiff Rolando Laviena-Torres is an

5    employee of the Puerto Rico Police Department ("PRPD") who claims that defendants

6    have failed to take sufficient measures to protect him and his family from harm by private

7    parties.  (Docket No. 18 at 3.)  He further alleges that some defendants retaliated against

8    him for demanding greater protections.  (Id. at 21-22.)

9         Plaintiff alleges three causes of action arising under federal law.  (Docket No. 18

10   at 22-23.)  His first cause of action is against all of the named defendants, for violations

11   of his constitutional rights to due process, equal protection, and free speech.  (Id. at 22.)

12   These claims relate mostly to the direct actions allegedly taken against him by Carlos J.

13   Colón-Alsina   ("Colón-Alsina "), Leovigildo Vázquez-Bonilla ("Vázquez-Bonilla"),

14   Echevarría, and Jorge Luyando ("Luyando").  (Id.)  His second cause of action is against

15   Emilio Díaz-Colón ("Díaz-Colón"), José Figueroa-Sancha ("Figueroa-Sancha"), and

16   Guillermo Somoza-Colombani ("Somoza-Colombani"), for their failure to properly

17   implement Puerto Rico's witness protection statute, and for failing to properly supervise

18   Plaintiff's superiors.  (Id. at 22-23.)  Plaintiff's third cause of action is against Figueroa-

19   Sancha and Díaz-Colón for their alleged failure to control and discipline Plaintiff's

20   supervisors.  (Id. at 23.)  Plaintiff seeks to sue all of the defendants in their personal

21   capacity.[3]  (Id. at 4.)

22        Plaintiff is joined in this suit by co-plaintiffs, including his wife, Nydia Lugo-

23   Rivera ("Lugo-Rivera"), and several of their minor children.   (Docket No. 18 at 2.)

_____
[3] Plaintiff also seeks to bring suit against unnamed defendants who will be added later.

1   Because it does not change the legal issues in the case, we refer to the lead plaintiff

2   simply as "Plaintiff" or "Laviena-Torres."  Also, none of the parties have presented any

3   arguments regarding the claims of Plaintiff's family members, whose claims appear to be

4   merely derivative of the lead Plaintiff's.  (Docket Nos. 27; 34; 40.)  We, therefore,

5   mention the other co-plaintiffs, such as Plaintiff's wife, Lugo-Rivera, only to the extent

6   that it affects our treatment of the legal issues in the case.

7        In 2011, Plaintiff alleges that he returned to the PRPD after a five-year absence.

8   (Docket No. 18 at 4.)  Plaintiff alleges that under PRPD regulations, he should have been

9   assigned to a re-training program in all the relevant skills he would need as a PRPD

10  officer.  (Id.)  Plaintiff states that he received no such re-training and was, nevertheless,

11  assigned to the PRPD region of Humacao as head of the storage facility in the precinct.

12  (Id.)  On March 27, 2011, Plaintiff stopped a vehicle in which passengers were drinking

13  alcohol in plain view.  (Id. at 5.)  During the stop, Plaintiff arrested two individuals

14  named Angel Vega-Solís ("Vega-Solís"), also known as "Tony Gatillo," or "Tony

15  Trigger," and Samuel Martínez-Ortiz ("Martínez-Ortiz").  (Id.)  Plaintiff also seized

16  several firearms, ammunition and magazines, one and one-half kilos of cocaine, and

17  $10,000 in cash.  (Id.)  Plaintiff alleges that the persons he arrested were suspected of a

18  number of murder cases.  (Id.)  A district attorney told Plaintiff to keep these individuals

19  detained until Monday, which he did.  (Id.)

20       On Monday morning, Plaintiff received a call from an agent with the federal

21  Alcohol, Tobacco and Firearms Bureau (ATF), who told Plaintiff that the federal

22  government would take over the case.  (Id. at 6.)  The ATF agent told Plaintiff to take the

23  detainees to the ATF's offices.   Both Vega-Solís and Martínez-Ortiz were then

24  prosecuted federally.  (Id.)  Vega-Solís was detained and sent to the Metropolitan

1   Detention Center ("MDC") in Guaynabo, and Martínez-Ortiz was released under

2   electronic monitoring at his home.

3        On Tuesday April 19, 2011, authorities working at the Bayamón Regional Prison

4   called PRPD Lieutenant Joseph Molina-Cabrera ("Molina-Cabrera"), an agent in the

5   Administrative Investigations unit of the San Juan region, to inform him about a text

6   message discovered on a cell phone at the Bayamón prison.  (Id. at 6.)  Authorities at the

7   Bayamón prison had seized a cell phone that had the following text message: "Tony

8   called me, wants you to investigate this guard Rolando Laviena Torres who lives in

9   'Aguacate.'  He is the key player in Tony's case. Where he lives and you..." (Id.)

10       Molina-Cabrera communicated this information to PRPD Lieutenant Sharon Ruiz-

11  Rivera ("Ruiz-Rivera").  (Id.)  Ruiz-Rivera then relayed this information in a written

12  memorandum to her supervisor, Captain Jorge Luyando ("Luyando").  (Id. at 6-7.)

13  Plaintiff alleges that despite Ruiz-Rivera's suggestions that Plaintiff be alerted to this

14  "threat," Luyando "did not seem very impressed or affected" by the information. (Id. at

15  7.)  Ruiz-Rivera then provided this information to the regional director of the PRPD,

16  Lieutenant Colonel Carlos J. Colón-Alsina  ("Colón-Alsina ").  (Id.)  At 8:30 P.M.,

17  another PRPD agent named Ortiz called Plaintiff and notified him of the message found

18  at the Bayamón prison.  (Id.)  Ortiz suggested that Plaintiff contact Colón-Alsina , which

19  he did.  Colón-Alsina told Plaintiff to call Luyando, who had important information for

20  Plaintiff.  (Id.)

21       Luyando then told Plaintiff to go to the Yabucoa district to meet with Captain

22  Cantre Catalá ("Cantre").  (Id. at 7-8.)  Plaintiff followed instructions and met with

23  Cantre, who showed Plaintiff the text message that had been discovered in the Bayamón

24  prison.  (Id.)   Cantre told Laviena that the message represented a threat. (Id.)  Cantre

1  assigned a portable radio to Plaintiff, and assigned a patrol to Plaintiff's house,

2  instructing the patrol to remain during the entire night shift at Plaintiff's residence.  (Id. at

3  8.)

4        The following day, on Wednesday, April 20, Plaintiff approached a director for

5  field operations in the region. (Id.)  Plaintiff asked what the plans were for his security,

6  and requested a long-arm rifle.  (Id.)  Echevarría told Plaintiff that he had to consult with

7  Colón-Alsina.  (Id.)  At around noon, Plaintiff met with Colón-Alsina , who allegedly

8  told Plaintiff that he did not consider the text message a threat.  (Id.)  Plaintiff became

9  upset, and later met with a number of PRPD agents to ask them what type of a plan they

10  had for the security and safety of him and his family.  (Id. at 8-9.)  An escort was then

11  assigned to Plaintiff's wife, Nydia Lugo-Rivera ("Lugo-Rivera").  (Id. at 9.)  Frustrated

12  with the response of Colón-Alsina, Plaintiff approached other PRPD and federal agents.

13  (Id. at 10-11.)  PRPD Lieutenant Colonel Lillian Rivera-Molina ("Rivera-Molina") then

14  granted Plaintiff's request for a long firearm, transferred him and his family to another

15  region on the island, and provided an escort to protect him and his family at their new

16  residence.  (Id.)  Rivera-Molina also ordered that the escort protect Plaintiff's older

17  children where they worked.  (Id. at 11.)

18        On April 24, Plaintiff informed Colón-Alsina  by text message that Plaintiff had

19  been summoned to provide testimony on April 26 in grand jury proceedings against

20  Vega-Solís and Martínez-Ortiz.  (Id.)  At 3:00 A.M., on Monday morning, April 25,

21  Plaintiff received a call from a PRPD agent in Yabucoa.  (Id.)  The agent informed

22  Plaintiff that his wife's day care center, a house that Plaintiff and his wife owned, "had

23  been burned down."  (Id.)

1   Plaintiff alleges that he then called Echevarría, Colón-Alsina, and Leovigildo

2   Vázquez-Bonilla, assistant superintendent for field operations, to let them know of the

3   situation and ask where the protection was that "they were supposedly providing his

4   house, his wife's business." (Id. at 11.)  Vázquez-Bonilla told Plaintiff that he had not

5   been informed of the gravity of the situation and that he would contact a colonel in the

6   area where Plaintiff had been transferred. (Id. at 11-12.)  Vázquez-Bonilla also promised

7   that a patrol would protect Plaintiff and his family, but it was not until 5:00 P.M. that a

8   patrol car arrived to Plaintiff's new residence. (Id. at 12.)  Plaintiff alleges that since that

9   day, no police cars have patrolled the area in front of his family's new residence.  (Id.)

10   On Tuesday, April 26, Plaintiff appeared at the grand jury and described the

11   relevant facts surrounding his arrest of Vega-Solís and Martínez-Ortiz.  (Id.)  The grand

12   jury found probable cause against both individuals.  (Id.)  He alleges that later, in June

13   2011, an inmate in Puerto Rico's prisons claimed that he was aware of a $35,000 contract

14   on Laviena's life.  (Id. at 17.)

15   Plaintiff alleges that he continued to press his superiors for greater protections of

16   himself and his family, as well as for mental health counseling.  (Id. at 11-18.)  In May

17   2011, Plaintiff's wife, Lugo-Rivera, wrote a letter to Figueroa-Sancha, the superintendent

18   of the PRPD, requesting a meeting to discuss the death threats against her husband.  (Id.

19   at 14.)  In July 2011, Plaintiff wrote a sixteen-page letter to Díaz-Colón, who was then

20   serving as superintendent of the PRPD, and to Figueroa-Sancha, who had recently left his

21   position as superintendent.  (Id. at 16.)  In the letter, Plaintiff notified Díaz-Colón and

22   Figueroa-Sancha of the events described herein. (Id.)  Plaintiff also requested an

23   investigation, greater protection, and redress for him and his family.  (Id.)  Plaintiff also

24   wrote a two-page letter to Puerto Rico's Secretary of Justice, Guillermo Somoza-

1  Colombani, informing Somoza-Colombani of the situation and seeking "redress for the
2  damages" suffered by him and his family.  (Id. at 19.)

3       None of these efforts yielded any response.  (Docket No. 18 at 16-19.)  Plaintiff
4  alleges that defendants have failed to comply with Puerto Rico's witness protection law,
5  as contained in 25 L.P.R.A. §§ 972-73.  See, e.g., 25 L.P.R.A. § 972 ("It is the public
6  policy of the Commonwealth of Puerto Rico to offer protection and assistance to victims
7  and witnesses in judicial proceedings elucidated in the courts as well as during the
8  investigations that are carried out, to promote their full cooperation and participation free
9  from intimidation in those proceedings.").  Puerto Rico's Secretary of Justice is the
10 official responsible for establishing the "necessary measures to prevent the intimidation
11 of victims, witnesses, potential witnesses, their family and relatives, and to provide them
12 with the protection and assistance that is deemed necessary at a given moment to assure
13 their participation in investigative and judicial proceedings." 25 L.P.R.A. § 972b.

14      Until November 2011, Plaintiff continued to work in Humacao despite the
15 perceived threats to him and his family.  (Id.)  Then, in November, Plaintiff requested,
16 and received, a meeting with José L. Rivera ("Rivera"), then associate superintendent of
17 the PRPD.  (Id. at 19.)  Rivera authorized a transfer of Plaintiff to another region outside
18 of Humacao, and ordered further training and mental health counseling for Plaintiff. (Id.
19 at 20.)  Plaintiff alleges that the PRPD psychologist who saw him told him that she was
20 unable to counsel him, because Plaintiff and his family had already been seeing a private
21 psychiatrist.  (Id.)  Plaintiff states that "[o]ther than subsequent transfers from Humacao
22 to four other work stations, the PRPD nor [sic] the named defendants have made any
23 contact" with Plaintiff or his family regarding an investigation of the threats to him.  (Id.)

1    Plaintiff alleges that in March 2012, Vázquez-Bonilla ordered a transfer of
2    Plaintiff to a different region that was not convenient for Plaintiff.  (Id. at 21.)  Plaintiff
3    alleges that the new region was far away from the new temporary home where his family
4    had been transferred following the threat.  (Id.)  Plaintiff further alleges that it would
5    have been more logical for him to stay in the same region where he was working.  (Id.)
6    Plaintiff had recently received a promotion to sergeant, and the region he was working in
7    was in need of supervisors.  Nevertheless, Vázquez-Bonilla ordered the transfer.  (Id.)

8    In June 2012, Plaintiff also received an order written by Colón-Alsina and
9    Vázquez-Bonilla, instructing him to return the long-arm rifle he had been previously
10   issued by another agent.  (Id.)  Plaintiff alleges that Colón-Alsina also took other
11   improper actions against him, by insisting that Plaintiff take sick leave or vacation time,
12   because Colón-Alsina did not have the resources to deal with him.  (Id. at 14-15.)
13   Plaintiff also alleges that Colón-Alsina unfairly reduced Plaintiff's working hours by the
14   amount of time Plaintiff had to spend commuting to his new temporary residence.  (Id.)
15   When Plaintiff asked Colón-Alsina about the threat found on the cell phone in the
16   Bayamón prison, Colón-Alsina responded: "I made a mistake, I'm human." (Id. at 15.)
17   Colón-Alsina then scolded Plaintiff and told him to stop going outside the chain of
18   command with his complaints.  (Id.)  Plaintiff alleges that the adverse actions that
19   Vázquez-Bonilla and Colón-Alsina took against him were retaliation for his First-
20   Amendment-protected activities.  (Id. at 22.)

21   Plaintiff seeks compensatory and punitive money damages for the emotional
22   suffering he and his family have endured; for the loss of their liberty and freedom of
23   movement; and for the loss of his wife's place of business, a home that they owned and
24   from which she operated a day care center.  (Id. at 25-26.)

1   **II.**

2   **Standard for Motion to Dismiss Under Rule 12(b)(6)**

3   **A.   Rule 12(b)(6)**

4   A defendant may move to dismiss an action, based solely on the complaint, for the

5   plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ.

6   P. 12(b)(6).  In assessing such a motion, we "accept[] all well-pleaded facts as true, and

7   we draw all reasonable inferences in favor of the [plaintiff]."  Wash. Legal Found. v.

8   Mass. Bar Found., 993 F.2d 962, 971 (1st Cir. 1993).

9   "[A]n adequate complaint must provide fair notice to the defendants and state a

10   facially plausible legal claim."  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st

11   Cir. 2011).  In considering a complaint's adequacy, we disregard "statements in the

12   complaint that merely offer legal conclusions couched as fact or threadbare recitals of the

13   elements of a cause of action."  Id. (internal quotation marks omitted).  We then take as

14   true what remains, "[n]onconclusory factual allegations . . . even if seemingly

15   incredible."  Id.  On the basis of those properly-pled facts, we assess the "reasonableness

16   of the inference of liability that the plaintiff is asking the court to draw."  Id. at 13.

17   **III.**

18   **Analysis**

19   **A.   Federal Claims**

20   Movants—Colón-Alsina,  Vázquez-Bonilla,  Figueroa-Sancha,  and  Somoza-

21   Colombani—and Echevarria argue that: 1) Plaintiff has failed to state a claim under §

1    1983; and 2) qualified immunity shields them from suit.[4]  (Docket Nos. 27; 34.)  Plaintiff

2    opposes.  (Docket No. 40.)

3          **1.    <u>Equal Protection</u>**

4          We first address Plaintiff's claims under the Equal Protection Clause of the U.S.

5    Constitution.  (Docket Nos. 18; 40.)  Defendants argue that Plaintiff has failed to state a

6    viable equal protection claim. (Docket Nos. 27 at 17; 34 at 17.)  To state a viable claim of

7    equal protection, a plaintiff must allege that "compared with others similarly situated,

8    [Plaintiff was] selectively treated . . . based on impermissible considerations such as race,

9    religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or

10   bad faith intent to injure a person." <u>Tapalian v. Tusino</u>, 377 F.3d 1, 6 (1st Cir. 2004)

11   (quoting <u>Barrington Cove Ltd. P'ship v. Rhode Island</u>, 246 F.3d 1, 7 (1st Cir. 2001)).

12   Plaintiff argues that his claim falls under this latter category, because defendants' actions

13   were based on impermissible considerations, and constituted a "gross abuse of power."

14   <u>See</u> <u>Baker v. Coxe</u>, 230 F.3d 470, 474 (1st Cir. 2000).  We disagree and find that Plaintiff

15   has failed to state a viable equal protection claim.

16         First, we note that Plaintiff has failed to make any argument under the "similarly

17   situated" prong of the equal protection framework.  This alone would be enough to doom

18   Plaintiff's claim.   The standard for determining whether individuals or entities are

19   "similarly situated" for equal protection purposes asks whether a prudent person,

20   examining the incidents alleged "would think them roughly equivalent and the

21   protagonists similarly situated . . . .  Exact correlation is neither likely nor necessary, but

22   the cases must be fair congeners.  In other words, apples should be compared to apples."

---

[4] The qualified immunity argument by Movants—Colón-Alsina, Vázquez-Bonilla, Figueroa-Sancha, and Somoza-Colombani—appears on pages 28-31 of their motion.  (Docket No. 27 at 28-31.)  Echevarría's qualified immunity argument appears on pages 20-23 of his motion.  (Docket No. 34 at 20-23.)

1   Barrington Cove, 246 F.3d at 8 (quoting Dartmouth Review v. Dartmouth Coll., 889 F.2d

2   13, 19 (1st Cir. 1989) (internal quotation marks omitted)).  At "the present stage in the

3   Rule 12(b)(6) analysis . . . it [is] necessary that [Plaintiff] allege these correlations with

4   reasonable particularity."  Id.

5          Plaintiff has failed to allege even what the relevant correlations are.  Reading the

6   factual allegations in the complaint, it would be difficult to conclude that Laviena-Torres

7   was similarly situated to any of his peers in the PRPD.  The countless complaints and

8   entreaties that Plaintiff made—to the superintendents of the PRPD, to Puerto Rico's

9   Secretary of Justice, to other officers, and to at least one federal agent—would naturally

10  set him apart from his colleagues in the eyes of his superiors.  Plaintiff has simply failed

11  to show that he was treated differently than others similarly situated to him.  See

12  Gianfrancesco v. Town of Wrentham, --- F.3d ----, No. 12-1677, 2013 WL 1364268 (1st

13  Cir. April 05, 2013), at *5 (dismissing equal protection claim that "does not mention any

14  other putative comparator.").

15         Furthermore, Plaintiff has failed to show that defendants' actions rose to the high

16  level necessary to create a "gross abuse of power." Baker v. Coxe, 230 F.3d 470, 474 (1st

17  Cir. 2000).  In his opposition brief, Plaintiff correctly cites to the relevant precedent

18  governing this standard.[5]  See Village of Willowbrook v. Olech, 528 U.S. 562, 566

19  (2000); Baker, 230 F.3d at 470; Rubinovitz v. Rogato, 60 F.3d 906, 912 (1st Cir. 1995).

20  But, even the most cursory review of these cases shows why Plaintiff's allegations do not

21  come close to satisfying this demanding standard.

22         In Rubinovitz, a city employee was "alleged to have engaged in a vendetta against

23  a landlord who had evicted her friend by enlisting other government officials from

---

[5] See Docket No. 40 at 16-17.

1   various departments to cut off the landlord's gas, water, and sewage services, to charge

2   the landlord with building code violations, and to frustrate relations with a contractor."

3   Baker, 230 F.3d at 474 (citing Rubinovitz, 60 F.3d at 908-09).   In addition to this

4   strikingly aggressive conduct, "there was not the slightest vestige of any legitimate

5   government purpose served."   Id.   The First Circuit held that this was "'only barely

6   enough evidence'" to survive summary judgment, illustrat[ing] the extreme 'malicious

7   orchestrated campaign' needed to surmount the constitutional threshold." Id. (quoting

8   Rubinovitz, 60 F.3d at 912).

9           Compared with the allegations in this case, the facts in Rubinovitz were "much

10  more stark." Id.  Most importantly, defendants' actions here, unlike in Rubinovitz, could

11  be construed as serving some legitimate state purpose.   That is not to say that all of

12  defendants' actions in this case were correct.   But, we must acknowledge the difficult

13  reality underlying the events in this case: Police departments must constantly make

14  difficult decisions, with limited resources, regarding the safety and management of their

15  employees.   The fact that defendants may have treated Plaintiff unfairly is not sufficient

16  to state a constitutional equal protection claim.   Cf. Esmail v. Macrane, 53 F.3d 176, 179,

17  180 (7th Cir.1995) (finding viable equal protection claim based upon (i) mayor's

18  "orchestrated campaign of official harassment directed against [plaintiff] out of sheer

19  malice" and (ii) "spiteful effort to 'get' [plaintiff] for reasons wholly unrelated to any

20  legitimate state objective"); see also Willowbrook, 528 U.S. at 566 (Breyer, J.,

21  concurring) (noting that some otherwise "ordinary violations of city or state law" may

22  become actionable under the equal protection clause provided the plaintiff proves "extra

23  factor[s]," such as "vindictive action," "illegitimate animus" or "ill will").  Because we

24  find that Plaintiff has failed to state a viable equal protection claim, his supervisory

1   liability claims must also be dismissed.  Rivera v. Rhode Island, 402 F.3d 27, 38-39 (1st

2   Cir. 2005) ("Since the plaintiff has failed to state a constitutional claim at all, her claims

3   against the other defendants for supervisory liability and for failure to train fail.") (citing

4   City of Canton v. Harris, 489 U.S. 378, 391 (1989)).  Therefore, Plaintiff's equal

5   protection claims will be dismissed as to Colón-Alsina, Vázquez-Bonilla, Figueroa-

6   Sancha, Somoza-Colombani, and Echevarría.

7              **2.    Due Process Claims**

8              Plaintiff alleges substantive and procedural due process violations under the U.S.

9   Constitution.  (Docket Nos. 18 at 22; 40 at 11, 15.)  Movants—Colón-Alsina, Vázquez-

10  Bonilla, Figueroa-Sancha, and Somoza-Colombani—and Echevarría argue that Plaintiff

11  has failed to state a viable claim under either theory of due process rights, and that

12  qualified immunity shields them from suit.  (Docket Nos. 27; 34.)  For the following

13  reasons, we agree that defendants are entitled to qualified immunity from Plaintiff's due-

14  process claims.

15             "The doctrine of qualified immunity protects a state official from liability for

16  damages under § 1983 where her conduct did 'not violate clearly established statutory or

17  constitutional rights of which a reasonable person would have known.'"  Rocket

18  Learning, Inc. v. Rivera-Sanchez, --- F.3d ---, No. 12-1642, 2013 WL 1668229, at *5 (1st

19  Cir. Apr. 13, 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 808 (1982)).  Because

20  qualified immunity offers "defendant public officials an immunity from suit and not a

21  mere defense to liability . . . immunity is to be resolved at the earliest possible stage in

22  litigation." Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009) (citations omitted).

23  Courts follow a two-step procedure when confronted with a plea of qualified immunity:

24  "A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a

1  violation of a constitutional right; and (2) if so, whether the right was 'clearly

2  established' at the time of the defendant's alleged violation." Id. at 268–69 (quoting

3  Pearson v. Callahan, 555 U.S. 223, 234 (2009)).

4         "To overcome qualified immunity, '[t]he contours of the right must be sufficiently

5  clear that a reasonable official would understand that what he is doing violates that

6  right.'" Id. (alteration in original) (quoting Anderson v. Creigton, 483 U.S. 635, 640

7  (1987)). Moreover, the "clearly established" inquiry "must be undertaken in light of the

8  specific context of the case, not as a broad general proposition." Rivera-Sanchez, 2013

9  WL 1668229 at *5 (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)). Thus, "[t]he

10  relevant, dispositive inquiry in determining whether a right is clearly established is

11  whether it would be clear to a reasonable [official] that his conduct was unlawful in the

12  situation he confronted." Maldonado, 568 F.3d at 269 (quoting Brosseau, 543 U.S. at

13  199) (internal quotation marks omitted).

14         In Pearson, the Supreme Court recognized that "[w]hen qualified immunity is

15  asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims

16  may be hard to identify." 555 U.S. at 238–39. "As such, federal courts have discretion to

17  administer the components of the qualified immunity test in the order that they determine

18  'will best facilitate the fair and efficient disposition of each case.'" Rivera-Sanchez, 2013

19  WL 1668229, at *6 (quoting Pearson, 555 U.S. at 242). If the court can "'quickly and

20  easily decide that there was no violation of clearly established law,' it need not 'turn[ ] to

21  the more difficult question [of] whether the relevant facts make out a constitutional

22  question at all.'" Id. (quoting Pearson, 555 U.S. at 239). Defendants bear the burden of

23  proof for establishing the affirmative defense. DiMarco-Zappa v. Cabanillas, 238 F.3d

24  25, 35 (1st Cir. 2001) (citing Harlow, 457 U.S. at 815). For the reasons laid out below,

1    we determine that the complaint has failed to allege the deprivation of any "clearly

2    established" constitutional right and thus, dismissal is appropriate.

3          We discuss briefly the basic elements of a constitutional due process claim.  To

4    state a viable substantive due process claim, "the plaintiff must show both that the acts

5    were so egregious as to shock the conscience and that they deprived him of a protected

6    interest in life, liberty, or property." Harron v. Town of Franklin, 660 F.3d 531, 536 (1st

7    Cir. 2011) (quoting Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006)). Moreover, a

8    plaintiff must show that state actors, rather than third parties, deprived him of the

9    protected interest.  See Rivera, 402 F.3d at 34 ("The Due Process Clause acts as a check

10   on the government, not on actions by private individuals.").  A defendant's mere failure

11   to protect a plaintiff from harm by third parties is not sufficient to ground a due process

12   claim. Id.

13         In this case, we assume, without deciding, that the home Plaintiff owned with his

14   wife was a constitutionally-protected property interest.[6]  Even assuming that Plaintiff was

15   deprived of a protected interest, however, Plaintiff's claims would fail.  The people who

16   burned down Plaintiff's home were private individuals, not government actors.  The

17   threats that Plaintiff was forced to evade came from Vega-Solís and Martínez-Ortiz, not

18   from defendants.  These allegations are insufficient to state a viable due process claim.

19   "The Supreme Court has stated that as a general matter, 'a State's failure to protect an

20   individual against private violence simply does not constitute a violation of the Due

21   Process Clause.'" Rivera, 402 F.3d at 34 (quoting DeShaney v. Winnebago County Dep't

22   of Soc. Servs., 489 U.S. 189, 197 (1989).

---

[6] Apart from this interest, it is not clear what other protected interests plaintiff can point to. We need not resolve this issue definitively because, as we explain below, Plaintiff's due process claims fail for at least two other reasons.

1    Plaintiff rightly acknowledges this well-established rule that defendants cannot be

2    held liable for failing to protect plaintiffs from harm by third parties.  (Docket No. 18.)

3    But he argues that his case is distinguishable from the facts of DeShaney and Rivera for

4    two reasons.    (Docket No. 40.)  Plaintiff argues that in this case, 1) defendants

5    affirmatively created the danger to Plaintiff, and 2) defendants' conduct shocked the

6    conscience.  (Id. at 11-15.)  We disagree on both counts.

7    In Rivera, the plaintiff made a very similar argument to the one advanced here:

8    That defendants' failure to implement the state witness protection statute violated her due

9    process rights.  Rivera v. Rhode Island, 312 F.Supp.2d 175, 184 (D.R.I. 2004).  We recite

10   briefly the "truly tragic" facts in Rivera to underscore how difficult it is for plaintiff to

11   prevail on the sort of claim advanced here.  Id. at 176.  In Rivera, a fifteen-year old

12   witness had repeatedly informed state authorities of death threats against her for her

13   participation as a witness in a murder trial.  Id. at 177.  The authorities repeatedly

14   promised her that they would protect her from any danger.  Id.  Days after a subpoena

15   issued to call her to testify, however, the witness was murdered.  Id.  The First Circuit

16   held that such claims, while deserving of sympathy, were not sufficient to state a

17   constitutional due process claim.  Rivera, 402 F.3d at 30 ("[O]ur question is one of

18   federal law, not one of sympathy. The Supreme Court has said that only in very rare

19   situations will the state's failure to protect someone amount to a constitutional violation,

20   even if the state's conduct is grossly negligent.").  The same result necessarily applies

21   here, where plaintiff's claims are much less striking.

22   Plaintiff argues that his complaint states a cognizable claim, because defendants

23   acted affirmatively to create the danger to Plaintiff.  We reject this argument for at least

24   two reasons.  First, we emphasize that the theory suggested by Plaintiff, the "state created

1    danger theory," has never been embraced by the First Circuit.  See Rivera, 402 F.3d at 34

2    (noting that "this court has, to date, discussed the state created danger theory, but never

3    found it actionable on the facts alleged.") (collecting cases).  Because the First Circuit has

4    never formally acknowledged the state created danger theory of liability, it is difficult to

5    see how such allegations could violate a right that was "clearly established."  See

6    McIntyre v. United States, 336 F.Supp.2d 87, 115 (D.Mass. 2004) ("If the state-created

7    danger theory is only 'emerging,' perforce it is not clearly established.") (citations

8    omitted).

9            Furthermore, the facts of this case do not rise to the level of a "supposed state

10   created danger theory."   Rivera, 402 F.3d at 34.  Cases in which courts have found a

11   constitutionally cognizable claim for state created danger involved affirmative acts that

12   directly increased the danger to the plaintiff.  See, e.g., Kallstrom v. City of Columbus,

13   136 F.3d 1055, 1066-67 (6th Cir. 1998) (noting that City of Columbus released

14   information from undercover officers' files to defense counsel, substantially increasing

15   the vulnerability of the officers to private acts of vengeance); Wood v. Ostrander, 879

16   F.2d 583, 589-90 (9th Cir.1989) (denying summary judgment motion in case where

17   officer abandoned plaintiff in a high-crime area after impounding her vehicle, resulting in

18   her rape by a stranger from whom she accepted a ride).  Compared with these cases, the

19   actions (or more accurately, failures to act) of the PRPD do not rise to the level of a clear

20   constitutional violation.  Soto v. Flores, 103 F.3d 1056, 1064 (1st Cir. 1995) (instructing

21   that "courts must be careful to distinguish between conventional torts and constitutional

22   violations, as well as between state inaction and action").

23           Requiring a police officer to arrest and testify against dangerous individuals, and

24   failing to provide him with all the protection that he deems necessary, cannot be the basis

1  for a substantive due process claim.  If such allegations were sufficient to state a claim,

2  police departments—which must regulate their employees in highly dangerous

3  situations—would be subject to near constant suits for constitutional violations.  See

4  Rivera, 402 F.3d at 37 (finding that subpoenas, witness identification, and efforts to

5  secure witness cooperation "are necessary law enforcement tools, and cannot be the basis

6  to impose constitutional liability on the state.").  Thus, Plaintiff's substantive due process

7  claims fail.  See id.  There is an additional reason why Plaintiff's substantive due process

8  claims fail:  Plaintiff's allegations do not shock the conscience of the court.  See Rivera,

9  402 F.3d at 35 ("Even if there exists a special relationship between the state and the

10  individual or the state plays a role in the creation or enhancement of the danger, under a

11  supposed state created danger theory, there is a further and onerous requirement that the

12  plaintiff must meet in order to prove a constitutional violation: the state actions must

13  shock the conscience of the court.") (citations omitted).  To shock the conscience of the

14  court, the executive's actions must be "truly outrageous, uncivilized, and intolerable."

15  Harron, 660 F.3d at 556 (quoting Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st

16  Cir.1999)).  The allegations here do not come close to clearing this difficult threshold.

17      The cases in which governmental conduct shocks the conscience "have often

18  involved state action that was highly physically intrusive."  Cruz-Erazo v. Rivera-

19  Montanez, 212 F.3d 617, 622 (1st Cir. 2000) (collecting cases).  Additionally, the

20  "conscience-shocking concept points clearly away from liability, or clearly toward it,

21  only at the ends of the tort law's culpability spectrum: Liability for negligently inflicted

22  harm is categorically beneath the constitutional due process threshold."  Cnty. of

23  Sacramento v. Lewis, 523 U.S. 833, 834 (1998).  On the other hand, "conduct

1  deliberately intended to injure in some way unjustifiable by any government interest is

2  the sort of official action most likely to rise to the conscience-shocking level." Id.

3          In this case, Plaintiff alleges that defendants failed to take adequate protective

4  measures and acted with deliberate indifference.  We do not find that any of defendants'

5  alleged actions shock the conscience.  The First Circuit has "deemed more offensive

6  conduct not to be conscience-shocking."  McConkie v. Nichols, 446 F.3d 258, 261-62

7  (1st Cir. 2006) (finding police detective's lies to suspect that his statements would remain

8  confidential during interrogation did not shock conscience); see also Cruz-Erazo, 212

9  F.3d at 623 (finding no conscience-shocking conduct where police officers deliberately

10  lied in official documents and perjured themselves in court proceedings); Souza v. Pina,

11  53 F.3d 423 (1st Cir. 1995) (finding no due process violation when murder suspect

12  committed suicide after prosecutors encouraged media to link him to series of murders).

13  Thus, Plaintiff's substantive due process claims will be dismissed.

14          Our finding that Plaintiff has failed to allege a deprivation by government actors

15  dooms his procedural, as well as substantive, due process claims.  "The first step in

16  assessing a procedural due process claim is to determine whether state action has

17  deprived the individual of a protected interest—life, liberty, or property . . . as our

18  discussion regarding substantive due process establishes, no state action led to the

19  deprivation and, therefore, her procedural due process claim[] fails." Souza, 53 F.3d at

20  428 n.5 (internal citations omitted).

21          In his opposition brief, Plaintiff argues that defendants' failure to comply with

22  Puerto Rico's witness protection statute, see 25 L.P.R.A. §§ 972-73, creates a procedural

1    due process violation.[7]  We disagree.  As we noted above, this is almost identical to the

2    procedural due process claim rejected in <u>Rivera</u>.  <u>See</u> <u>Rivera</u>, 312 F.Supp.2d at 184

3    ("[E]ven assuming, arguendo, that the defendants did not follow the statutory

4    requirements, it is well settled that a failure to comply with state law does not establish

5    the basis for a federal due process violation.") (citing <u>D.R. by L.R. v. Middle Bucks Area</u>

6    <u>Vocational Technical Sch.</u>, 972 F.2d 1364, 1375) (3d Cir. 1992).  Because Plaintiff has

7    failed to allege the violation of any clearly established right by defendants, qualified

8    immunity applies.  <u>See</u> <u>id.</u>

9           Nor can any of the individual defendants be found liable on a supervisory liability

10   theory.  <u>See</u> <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 275 (1st Cir. 2009) (noting that

11   supervisory liability for alleged substantive due process violations requires a showing of

12   "'supervisory encouragement, condonation or acquiescence or gross negligence

13   amounting to deliberate indifference.'" (quoting <u>Estate v. Bennett</u>, 548 F.3d 155, 176-77

14   (1st Cir. 2008).  Moreover, supervisory liability is found only if there is an "affirmative

15   link between the behavior of a subordinate and the action or inaction of his supervisor

16   such that the supervisor's conduct led inexorably to the constitutional violation." <u>Id.</u>

17   (quoting <u>Pineda v. Toomey</u>, 533 F.3d 50, 54 (1st Cir. 2008)) (internal quotation marks

18   omitted).  To prevail on a theory of deliberate indifference, plaintiff must show that "it

19   would be manifest to any reasonable official that his conduct was very likely to violate an

20   individual's constitutional rights." <u>Id.</u> (quoting <u>Pineda</u>, 533 F.3d at 54).  Plaintiff's

21   threadbare allegations with respect to Somoza-Colombani, Figueroa-Sancha and Díaz-

---

[7] Echevarría argues that Plaintiff's complaint fails to state any of the necessary elements of a procedural due process claim.  (Docket No. 34 at 16.)  Movants—Colón-Alsina, Vázquez-Bonilla, Figueroa-Sancha, and Somoza-Colombani—argue that Plaintiff has failed to allege the process that was due to them, and failed to exhaust the procedures provided by state law.  (Docket No. 27 at 16.)  Plaintiffs respond by citing to various allegations in their complaint, contending that their procedural due process claims are well pleaded.  (Docket No. 40 at 15.)

1    Colón do not satisfy any of these requirements.  Because qualified immunity shields all

2    of the defendants from suit, Plaintiff's due process claims will be dismissed as to Colón-

3    Alsina, Vázquez-Bonilla, Figueroa-Sancha, Somoza-Colombani, and Echevarría.  See

4    Velez-Diaz v. Vega-Irizarry, 421 F.3d 71, 81 (1st Cir. 2005) ("Absent a showing that the

5    agents' conduct violated a constitutional right, qualified immunity applies.").

6         **3.    First Amendment**

7         Plaintiff also alleges a violation of his right to freedom of speech under the First

8    Amendment.  (Docket No. 18.)   Movants—Colón-Alsina, Vázquez-Bonilla, Figueroa-

9    Sancha, and Somoza-Colombani—and Echevarría argue that Plaintiff has failed to state a

10   claim under the First Amendment.  (Docket Nos. 27; 34.)  For the following reasons, we

11   find that qualified immunity shields some, but not all, defendants from Plaintiff's First

12   Amendment claim.  See Dirrane v. Brookline Police Dep't, 315 F.3d 65 (1st Cir. 2002)

13   ("Immunity exists even where the abstract 'right' invoked by the plaintiff is well-

14   established, so long as the official could reasonably have believed 'on the facts' that no

15   violation existed."); Diaz-Bigio v. Santini, 652 F.3d 45 (1st Cir. 2011) (noting that

16   qualified immunity protects all officers except those who are clearly incompetent)

17   (citations omitted).

18        Before deciding the immunity question, we first discuss the requirements of a First

19   Amendment retaliation claim by a public employee.  Decotiis v. Whittemore, 635 F.3d 22

20   (1st Cir. 2011).  The law is "settled that as a general matter the First Amendment

21   prohibits government officials from subjecting an individual to retaliatory actions . . . for

22   speaking out." Id. (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)).  This

23   protection, however, is not absolute. "[I]n recognition of the government's interest in

24   running an effective workplace, the protection that public employees enjoy against

1   speech-based reprisals is qualified." Id. (internal citations and quotation marks omitted);

2   see also Waters v. Churchill, 511 U.S. 661, 675 (1994) (plurality opinion) ("When

3   someone who is paid a salary so that she will contribute to an agency's effective

4   operation begins to do or say things that detract from the agency's effective operation, the

5   government employer must have some power to restrain her.").

6        A plaintiff must meet three requirements to state a viable claim of unconstitutional

7   retaliation in public employee speech cases. Decotiis, 435 U.S. at 29-30.   First, the

8   employee must have been speaking "as a citizen on a matter of public concern." Id. at 29

9   (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).   Second, the court must

10  "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of

11  public concern and the interest of the State, as an employer, in promoting the efficiency

12  of the public services it performs through its employees." Id. (quoting Pickering v. Bd. of

13  Educ., 391 U.S. 563, 568 (1968)).   This balancing test "is necessary in order to

14  accommodate the dual role of the public employer as a provider of public services and as

15  a government entity operating under the constraints of the First Amendment." Diaz-

16  Bigio, 652 F.3d at 51 (quoting Rankin v. McPherson, 483 U.S. 378, 384 (1987)).   Third,

17  the employee must "show that the protected expression was a substantial or motivating

18  factor in the adverse employment decision." Decotiis, 635 F.3d at 29 (quoting Curran v.

19  Cousins, 509 F.3d 36, 45 (1st Cir. 2007)).

20       The Garcetti analysis is highly "particularized" and "context-specific."   Decotiis,

21  635 F.3d at 31, 35 n.15.  Moreover, the First Circuit has made clear that "the fact-

22  intensive nature of the Garcetti analysis does not easily lend itself to dismissal on a Rule

23  12(b)(6) motion." Id. at 35 n.15.  That is because at the motion to dismiss stage, where

24  we must indulge all inferences in favor of the plaintiff, it can be difficult to conclude

1    whether the speech is protected.  Id.  The context-specific nature of the Garcetti inquiry

2    often requires more facts than are furnished by the complaint.  See id. (noting that the

3    complaint did not state where the speech occurred); see also Jordan v. Carter, 428 F.3d

4    67, 75 (1st Cir. 2005) (noting the lack of details regarding "the statements that plaintiff

5    made, to whom, and at least to some extent, their timing.").  In cases where a plaintiff

6    sets forth a complete and detailed recitation of the facts, as in Dirrane, dismissal may be

7    appropriate.  See Dirrane, 315 F.3d at 65 (describing "very lengthy" complaint with

8    detailed allegations).  Here, the Plaintiff's complaint sets forth a considerable amount of

9    detail regarding the speech's location, audience, and time.  As in Dirrane, these details

10   permit us to undertake a relatively comprehensive factual analysis, at least with respect to

11   some defendants.  See id.

12        Movants—Colón-Alsina, Vázquez-Bonilla, Figueroa-Sancha, and Somoza-

13   Colombani—argue that the actions defendants took against Plaintiff cannot ground a First

14   Amendment claim, because no materially adverse employment actions were taken against

15   him.  (Docket No. 27 at 28.) This argument fails.  See Barton v. Clancy, 632 F.3d 9

16   ("Even 'relatively minor events' can give rise to § 1983 liability, so long as the

17   harassment is not so trivial that it would not deter an ordinary employee in the exercise of

18   his or her First Amendment rights.") (quoting Rivera-Jiménez v. Pierluisi, 362 F.3d 87,

19   94–95 (1st Cir. 2004)). Plaintiff alleges that the following actions were taken as

20   retaliation for his protected speech: 1) he was transferred to a new region that was far

21   from the temporary residence where Plaintiff's family had been relocated; 2) he was

22   asked to return the long-arm rifle that he had been issued; 3) Colón-Alsina told Plaintiff

23   to take vacation or sick leave; and 4) his working hours were unfairly reduced because of

24   the time that Plaintiff had to spend commuting to his new residence.  (Docket No. 18 at

1    14-16.)   We think that these allegations, in addition to the "ill will" that Plaintiff

2    attributes to Vázquez-Bonilla and Colón-Alsina, would be sufficient to deter a

3    "reasonably hardy" employee from engaging in protected speech.  Clancy, 632 F.3d at 29

4    (citations omitted).  Therefore, we proceed to the three requirements laid out in Decotiis,

5    635 F.3d at 29.

6         **a.  Public Concern**

7         Movants—Colón-Alsina,   Vázquez-Bonilla,   Figueroa-Sancha,   and   Somoza-

8    Colombani—argue that Plaintiff was not speaking on a matter of public concern when he

9    sought greater protections for himself and his family.  (Docket No. 27 at 20-27.)  They

10   characterize Plaintiff's speech as addressed only to internal personal matters, such as

11   Plaintiff's dissatisfaction and displeasure with his supervisors.  (Docket No. 27 at 26.)

12   Movants—Colón-Alsina, Vázquez-Bonilla, Figueroa-Sancha, and Somoza-Colombani—

13   argue that this case is therefore analogous to Connick v. Myers, 461 U.S. 138 (1981).

14   We disagree.

15        In Connick, the Supreme Court reversed the entry of judgment in favor of a public

16   employee who had been terminated.  Id. The employee was an assistant district attorney

17   who circulated an interoffice questionnaire, "soliciting the views of her fellow staff

18   members concerning office transfer policy, office morale, the need for a grievance

19   committee, the level of confidence in supervisors, and whether employees felt pressured

20   to work in political campaigns."  Id. at 141.  The district court held that she had been

21   wrongly terminated for exercising her First Amendment rights, and the Court of Appeals

22   affirmed.  Id. at 141-42. The Supreme Court reversed, holding that the questionnaire was

23   not protected speech, because it raised little more than an "employee grievance

24   concerning internal office policy."  Id. at 154.  In light of the questionnaire's potential to

1  disrupt the office and undermine the employer's authority, the Supreme Court held that

2  the employee's termination was justified.  Id.

3          Several factors distinguish this case from Connick.  For one, this case comes to us

4  at the motion to dismiss stage.  Plaintiff has not had the opportunity to present evidence

5  and perform discovery, as the plaintiff was able to in Connick.  Nor is it possible, based

6  on the allegations in the complaint, to surmise whether the employer's actions against

7  Plaintiff were justified in this case.  We know very little about what motivated Colón-

8  Alsina and Vázquez-Bonilla to take adverse actions against Plaintiff.  There are sufficient

9  factual allegations in the complaint to make Plaintiff's claim of retaliatory motives

10 plausible.

11         More fundamentally, though, we must disagree with defendants' characterization

12 of Plaintiff's speech as touching upon "matters only of personal interest."  (Docket No.

13 27 at  25.)  The subject of Plaintiff's speech—the state's ability to protect witnesses and

14 their families—is a topic of clear public interest.  As the First Circuit has acknowledged:

15 "Intimidation and even murder of witnesses is a growing national problem in major urban

16 areas, plaguing witnesses, law enforcement officers, and the communities. It is in the

17 interests of the police to protect witnesses, in order to secure convictions." Rivera, 402

18 F.3d at 38.  Moreover, the fact that an employee's speech is related to his job does not

19 strip the speech of protection.  Garcetti, 547 U.S. at 422.  In fact, the Supreme Court has

20 recognized that important values are served when public employees inform the public

21 about subjects within their expertise:

22                 Teachers are, as a class, the members of a community most
23                 likely to have informed and definite opinions as to how
24                 funds allotted to the operation of the schools should be
25                 spent. Accordingly, it is essential that they be able to speak
26                 out  freely  on  such  questions  without  fear  of  retaliatory

1          dismissal. The same is true of many other categories of
2          public employees.
3
4    Id. (quoting Pickering, 547 U.S. at 959) (internal quotation marks omitted).
5
6          The relevant test for approaching this case comes not from Connick, but rather

7    Garcetti, where the Supreme Court held that a public employee's speech receives

8    protection only if "the employee spoke as a citizen on a matter of public concern."

9    Garcetti, 547 U.S. at 418.  To determine whether such speech was made pursuant to

10   official responsibilities requires courts to take "a hard look at the context of the speech."

11   Decotiis, 635 F.3d at 29 (citing Foley v. Town of Randolph, 598 F.3d 1 (1st Cir. 2010)).

12   "Although no one contextual factor is dispositive," there are several "non-exclusive"

13   factors that guide our inquiry.  See id.  Based on our analysis of these factors, we

14   conclude that Plaintiff has made a plausible claim of protected speech.

15         An important factor guiding our analysis is whether the speech "owes its existence

16   to the plaintiff's employment responsibilities."  Garcetti, 547 U.S. at 420-21.  In Garcetti,

17   the Supreme Court held that a legal memorandum written by a state prosecutor, in which

18   the prosecutor questioned the validity of a search warrant, was not protected speech. Id.

19   at 421.  The attorney's memorandum was not protected "because that is part of what

20   [plaintiff], as a calendar deputy, was employed to do."  Id.  Elaborating on this theme, the

21   Supreme Court included the following definitions of non-protected speech: "speech that

22   'owes its existence to a public employee's professional responsibilities', speech that the

23   employer 'has commissioned or created', speech that the employee 'was paid to' make,

24   speech that the employee's 'duties . . . required him to' make, speech that amounts to the

25   employee's 'work product', and speech that is an 'official communication [ ].'" Mercado–

26   Berrios v. Cancel-Alegria, 611 F.3d 18, 27 n. 9 (1st Cir. 2010) (quoting Garcetti, 547

1    U.S. at 421–23).  Plaintiff's speech here does not fit within any of these categories.

2    Speaking out on issues of witness security is not one of the job responsibilities for which

3    Plaintiff, a relatively low-ranking police officer, is paid his salary.

4           Related to this inquiry is whether the employee's speech "bore the appearance of

5    official status or significance." Decotiis, 635 F.3d at 33.  In Abcarian v. McDonald, 617

6    F.3d 931, 937 (7th Cir. 2010), the Seventh Circuit found that the plaintiff's speech was

7    made pursuant to his employment responsibilities.  Id.   The plaintiff, as head of two

8    major university surgery departments, had a "broader responsibility to speak in the course

9    of his employment obligations."  Id.  He should have, therefore, expected that when he

10   spoke on issues relating to the functioning of the hospitals, his speech would carry the

11   hallmark of an official communication.  Id.  In Foley, the First Circuit found it "relevant

12   and important to the inquiry" that a fire chief's statements were made "in uniform and on

13   duty." 598 F.3d at 7, n.9 (finding speech not protected).  Here, unlike in Foley, only some

14   of Plaintiff's speech occurred during working hours.   Plaintiff's 3 A.M. phone call to

15   Colón-Alsina, Vázquez-Bonilla and Luyando occurred when Plaintiff was not on duty.

16   (Docket No. 18 at 11.)  Though Plaintiff's complaint does not specify when he and his

17   wife wrote their letters to Figueroa-Sancha, Díaz-Colón, and Somoza-Colombani, it is

18   certainly plausible that these communications occurred outside of normal working hours.

19   See Decotiis, 635 F.3d at 34 (noting that courts must "indulg[e] every inference in favor

20   of" plaintiff).

21          Another factor asks whether there is a "citizen analogue" for the speech made by a

22   public employee.  Decotiis, 635 F.3d at 32 (citing Garcetti, 547 U.S. at 423).   As the

23   Supreme Court explained in Garcetti: "Employees who make public statements outside

24   the course of performing their official duties retain some possibility of First Amendment

1    protection because that is the kind of activity engaged in by citizens who do not work for

2    the government." Id.  Here, it is easy to imagine the "citizen analogue" for Plaintiff's

3    speech.  Many cooperating witnesses are not public employees but members of the

4    general citizenry.  If a cooperating citizen witness had her house burned down and then

5    wrote letters to law enforcement officials demanding greater protections and criticizing

6    the state's witness security program, the speech would likely be protected. Decotiis, 635

7    F.3d at 32.

8        An additional factor asks to whom the speech was directed.   See Decotiis, 635

9    F.3d at 33 (holding that "speech made to an audience to which an employee only has

10   access through her job is generally less akin to citizen speech").  It is true that the

11   majority of Plaintiff's speech was addressed to Plaintiff's supervisors in law enforcement,

12   rather than to the general public.  But on the other hand, Plaintiff did raise his concerns

13   with other law enforcement agencies, such as the ATF agent and Puerto Rico's Secretary

14   of Justice.  Other circuits have held that if an employee contacts other law enforcement

15   agencies, the speech is likely protected.  See Fox v. Traverse City Area Public Schools

16   Bd. of Educ., 605 F.3d 345, 349 ("Because the plaintiff officer reported his employer's

17   illegal acts to an outside law enforcement agency, rather than solely to his supervisors,

18   we held that those statements were obviously not made pursuant to the plaintiff's official

19   duties.") (citing See v. City of Elyria, 502 F.3d 484, 493 (6th Cir.2007)).

20       Given the foregoing, and keeping in mind the First Circuit's clear instructions in

21   Decotiis, we find that Plaintiff has made a plausible claim of citizen speech.  See

22   Decotiis, 635 F.3d at 35 ("In short, while we cannot conclusively say that Plaintiff's

23   speech was made as a citizen, the scope of our review on a motion to dismiss does not

1    demand as much; it is sufficient that the complaint alleges facts that plausibly set forth

2    citizen speech.").

3          **b.**   **Balancing Test**

4          The second step of the <u>Decotiis</u> test requires us to balance "the interests of the

5    [employee], as a citizen, in commenting upon matters of public concern and the interest

6    of the State, as an employer, in promoting the efficiency of the public services it performs

7    through its employees." <u>Decotiis</u>, 635 F.3d at 29 (quoting <u>Pickering</u>, 391 U.S. at 568).

8    Assuming that Plaintiff's perception of the threat was accurate, he had a very important

9    interest in pursuing protection for himself and his family.  Moreover, the topic of witness

10   security is a pressing issue to the people of Puerto Rico, who live with high levels of

11   violent crime.  On the other hand, we must also bear in mind "the government's need to

12   limit distractions, conserve resources, and maintain esprit in the workplace." <u>Dirrane</u>, 315

13   F.3d at 69 (collecting cases).  This interest "is particularly acute in the context of law

14   enforcement, where there is a 'heightened interest . . . in maintaining discipline and

15   harmony among employees.'" <u>Jordan</u>, 428 F.3d at 74 (quoting <u>Moore v. Wynnewood</u>, 57

16   F.3d 924, 934 (10th Cir. 1995) (citation omitted)).

17         When balancing these factors, we keep in mind the First Circuit's instructions that

18   the defendants' "motivation is important here, too." <u>Id.</u> at 74.  If the evidence shows that

19   the actions of Colón-Alsina and Vázquez-Bonilla were necessary to preserve the internal

20   order of the force, they will likely be protected from liability.  Defendants may have had

21   a reasonable "basis for distrusting [Plaintiff's] judgment." <u>Jordan</u>, 428 F.3d at 75 (citing

22   <u>Dirrane</u>, 315 F.3d at 71).  On the other hand, if Colón-Alsina and Vázquez-Bonilla

23   retaliated "entirely out of self-interest to silence legitimate criticism," Plaintiff may have

24   a First Amendment claim against them. <u>Id.</u>  At this stage of the case, where we have only

1    the complaint to guide us, it is difficult to tell whether defendants' actions were in fact

2    necessary measures for the good of the force. We need more facts to be able to perform a

3    proper balancing of the competing interests here.  At this stage, it would be premature to

4    conclude that defendants' interests trumped Plaintiff's.

5          **c.    <u>Substantial or Motivating Factor</u>**

6          The third part of the <u>Garcetti</u> test requires the plaintiff to "show that the protected

7    expression was a substantial or motivating factor in the adverse employment decision."

8    <u>Decotiis,</u> 635 F.3d at 29 (quoting <u>Curran v. Cousins,</u> 509 F.3d 36, 45 (1st Cir. 2007)).

9    Here is where Plaintiff's complaint breaks down against most of the defendants charged

10   in this action.   The only defendants who Plaintiff mentions as being motivated by

11   retaliation are Colón-Alsina and Vázquez-Bonilla.  (Docket No. 18 at 21.)  Moreover,

12   from our own reading of the complaint, none of the other defendants took adverse actions

13   against Plaintiff that can be plausibly described as retaliation for Plaintiff's protected

14   speech. <u>See</u> <u>also</u> <u>Dirrane</u>, 315 F.3d at 69 ("Immunity exists even where the abstract

15   'right' invoked by the plaintiff is well-established, so long as the official could

16   reasonably have believed 'on the facts' that no violation existed.").   Nor are there

17   sufficient allegations to ground an action against Figueroa-Sancha, Somoza-Colombani

18   or Díaz-Colón on a theory of supervisory liability.   <u>See</u> <u>Maldonado</u>, 568 F.3d at 275

19   (holding that supervisory liability is found only if there is an "affirmative link between

20   the behavior of a subordinate and the action or inaction of his supervisor such that the

21   supervisor's conduct led inexorably to the constitutional violation.") (quoting <u>Pineda</u>, 533

22   F.3d at 54) (internal quotation marks omitted).  Therefore, Plaintiff's First Amendment

23   retaliation claims will stand as to Colón-Alsina and Vázquez-Bonilla only; each of the

1   other defendants who moved for dismissal is protected by qualified immunity from these

2   claims.

3   **B.**      **Supplemental Claims**

4          Movants—Colón-Alsina,   Vázquez-Bonilla,   Figueroa-Sancha,   and   Somoza-

5   Colombani—and Echevarría argue that if Plaintiff's federal claims are dismissed,

6   Plaintiff's supplemental claims under Puerto Rico law should also be dismissed.  (Docket

7   Nos. 27 at 31; 34 at 23.)  Obviously, this is a failing argument with respect to Colón-

8   Alsina and Vázquez-Bonilla, in light of our ruling that Plaintiff has stated a viable federal

9   claim against these defendants.  Therefore, we will retain jurisdiction over Plaintiff's

10  supplemental claims as to Colón-Alsina and Vázquez-Bonilla.

11         The Supreme Court has stated that "if the federal claims are dismissed before trial,

12  . . . the state claims should be dismissed as well." United Mine Workers v. Gibbs, 383

13  U.S. 715, 726 (1966). This is not a "mandatory rule to be applied inflexibly in all cases,"

14  but it does apply "in the usual case." Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350

15  n. 7 (1988). We must still consider whether various factors, including comity, judicial

16  economy, convenience, and fairness, point in favor of retaining jurisdiction. Id. (internal

17  citations omitted).

18         Having considered these factors, we decide not to exercise supplemental

19  jurisdiction over Plaintiff's Commonwealth law claims against the defendants dismissed

20  from this action: Echevarría, Figueroa-Sancha, and Somoza-Colombani. See Redondo

21  Constr. Corp. v. Izquierdo, 662 F.3d 42, 49 (1st Cir. 2011) (instructing courts to exercise

22  their "informed discretion" whether to retain supplemental jurisdiction) (quoting Roche

23  v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256–57 (1st Cir. 1996)).  Both parties

24  have focused their efforts here on the federal claims; the Puerto Rico law issues have

1  received much less attention. Moreover, we see little basis for exercising jurisdiction over

2  Echevarría, Figueroa-Sancha, and Somoza-Colombani when the main federal

3  jurisdictional hook is so clearly lacking.  Accordingly, Plaintiff's Commonwealth claims

4  against Echevarría, Figueroa-Sancha, and Somoza-Colombani are dismissed without

5  prejudice pursuant to 28 U.S.C. § 1367(c)(3).

6                                              **IV.**

7                                         <u>**Conclusion**</u>

8          Given the foregoing, we hereby **GRANT** the motion to dismiss filed by

9  Echevarría. (Docket No. 34.)   We **GRANT IN PART AND DENY IN PART** the

10  motion to dismiss filed by Movants—Colón-Alsina, Vázquez-Bonilla, Figueroa-Sancha,

11  and Somoza-Colombani. (Docket No. 27.)  With respect to Echevarría, Figueroa-Sancha,

12  and Somoza-Colombani, all of Plaintiff's federal claims are **DISMISSED WITH**

13  **PREJUDICE**; Plaintiff's supplemental Commonwealth claims against these defendants

14  are **DISMISSED WITHOUT PREJUDICE** to state court litigation of these claims, if

15  Plaintiff so wishes.  With respect to Colón-Alsina and Vázquez-Bonilla, Plaintiff's equal

16  protection and due process claims are **DISMISSED WITH PREJUDICE**.   Against

17  Colón-Alsina and Vázquez-Bonilla, Plaintiff's First Amendment retaliation claims, as

18  well as his supplemental Puerto Rico law claims, remain viable, at least at this stage of

19  the proceedings.

20          Because neither Díaz-Colón nor Luyando has moved for dismissal, we will give

21  Plaintiff an opportunity to show cause why his claims against those defendants should not

22  also be dismissed.  Based on our reading of the complaint, and the applicable law

23  discussed above, we do not see how Plaintiff's claims against Díaz-Colón and Luyando

1  have any merit.  Plaintiff must **SHOW CAUSE, on or before May 24, 2013,** as to why

2  these claims should not be dismissed as to these defendants.

3     **IT IS SO ORDERED.**

4     San Juan, Puerto Rico, this 13th day of May, 2013.

5                                                          S/José Antonio Fusté
6                                                          JOSE ANTONIO FUSTE
7                                                          U. S. DISTRICT JUDGE